United States Court of Appeals
Fifth Circuit

**F I L E D**

April 8, 2005

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 04-30087

In The Matter Of: GUILFORD JOSEPH ACOSTA

DEBTOR

----------------------------------------

GENERAL ELECTRIC CAPITAL CORPORATION

Appellant

v.

GUILFORD JOSEPH ACOSTA

Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH and GARZA, Circuit Judges, and VANCE,* District
Judge.

VANCE, District Judge:

General Electric Capital Corporation appeals the district

court's affirmance of the bankruptcy court's decision that

---

*District Judge of the Eastern District of Louisiana,
sitting by designation.

refused to hold the debt of Guilford Acosta to GECC nondischargeable.  Because we find no clear error in the court's treatment of the debt under 11 U.S.C. § 523(a)(2)(A), and we find that GECC waived its appeal of the issue of nondischargeability under 11 U.S.C. § 523(a)(2)(B), we affirm.

**I. FACTS AND PROCEEDINGS BELOW**

Acosta was the corporate secretary, chief administrative officer, and director of Arnoult Equipment & Construction, Inc., an oilfield repair and refurbishment operations company.  On March 11, 1994, WRT Energy Corporation, AEC's primary customer, advanced $360,000.00 to AEC for the purchase of the vessel M/V ENERGY VII.  WRT also advanced a substantial amount of money that AEC used to refurbish the vessel so that AEC could use the vessel in oilfield work for WRT.  On December 4, 1994, AEC executed a $1.8 million promissory note and a preferred ship mortgage on the ENERGY VII in favor of WRT.  Acosta signed the authorizing resolution for the transaction and understood that the note and mortgage created a legal obligation.

In early 1995, WRT and AEC disputed the outstanding balances of certain invoices that AEC had submitted for work it performed for WRT.  On May 18, 1995, AEC and WRT resolved the dispute by agreeing in a memorandum of understanding that a $1,017,000 payment from WRT to AEC was "payment in full for all goods and services rendered through this date."  On the same day, AEC

Energy Marine, an AEC subsidiary, executed a $3.4 million promissory note and a mortgage in favor of WRT on five vessels that AEC Energy Marine purportedly owned, including the M/V JANE R. Acosta signed the authorizing resolution for the mortgage. AEC and WRT also entered a new agreement, called a master service contract, under which they restructured their business relationship and required WRT to make monthly payments to AEC for the work AEC performed.

Acosta testified that he believed that the May 18, 1995 memorandum of understanding extinguished AEC's $1.8 million note and accompanying mortgage on the ENERGY VII. The memorandum does not mention the AEC promissory note or the mortgage on the ENERGY VII, and Acosta wrote a letter five months later acknowledging that the ENERGY VII was subject to a $1.8 million mortgage in favor of WRT. By way of explanation, Acosta testified that when he acknowledged the mortgage, he meant simply to indicate that the mortgage existed as "signed paperwork," and he continued to believe that it had been discharged by the agreement between the two companies.

On August 16, 1995, Claude Mayfield, the captain of the ENERGY VII, was injured on the vessel. In September 1995, Mayfield's attorney contacted Acosta to demand that AEC provide Mayfield with maintenance and cure benefits. The attorney told Acosta that if the benefits were not provided, he would file a lawsuit and seize the ENERGY VII. On September 8, 1995, the

insurance carrier for the ENERGY VII informed Acosta that insurance on the vessel had been cancelled as of August 11, 1995.

By the end of 1995, WRT had developed serious financial trouble, and it stopped paying AEC the amounts due under the master service contract.  As a result, in late November or early December 1995, AEC entered negotiations with GECC for a working capital loan.  Acosta was the contact person for the negotiations.  AEC offered GECC three vessels as collateral for the loan, including the ENERGY VII and the JANE R.  Before it did so, AEC searched the United States Coast Guard records, which reflected that the vessels were clear of all recorded liens, including the WRT mortgage on the ENERGY VII.  The Coast Guard's abstract of title listed the WRT mortgage on the Energy VII as terminated.[1]  Acosta participated in the decision to offer the vessels as collateral for the GECC loan.

AEC provided GECC with a financial statement for 1994 that was prepared by a certified public accountant, based on information provided by AEC's chief financial officer.  AEC also produced an internally prepared financial report for 1995.  Acosta reviewed both documents to ensure they were accurate to the best of his knowledge.  There was no evidence that Acosta

---

[1] On January 22, 1997, well after the loan closed, the Coast Guard notified GECC's counsel that this abstract of title was erroneous, that a revised abstract of title indicated that WRT did have a mortgage on the ENERGY VII, and that WRT's mortgage was superior to GECC's mortgage.

transmitted the financial statements himself, but he was listed as a contact person. The only financial documents that Acosta personally forwarded to GECC were AEC revenue projections, which he testified were given to him by the CFO.

On December 6, 1995, Mayfield sued AEC's subsidiaries, AEC Energy Marine and Energy Labor Services, in federal district court and served Acosta as AEC Energy Marine's agent. Mayfield did not sue the ENERGY VII *in rem* and did not seek to seize the vessel. On December 11, 1995, GECC sent AEC a loan proposal for $1,173,170 to be secured by the ENERGY VII, the ENERGY VI, and the JANE R. AEC President James Arnoult accepted the proposal. Acosta did not sign it.

On March 12, 1996, Mayfield entered a default judgment against two AEC subsidiaries. Ten days later, GECC made a loan to AEC, but the principal amount was $656,625, not $1,173,170 as mentioned in the loan proposal. Acosta was present when the mortgage and promissory note were executed on AEC's behalf, but only Arnoult signed the mortgage. The mortgage states that "[t]he Owner lawfully owns and is lawfully possessed of each of the Vessels free from any lien or other encumbrance whatsoever prior to the lien of this Mortgage." As the corporate secretary, Acosta signed the authorizing resolutions for the mortgage. At the closing, GECC requested that AEC provide "key man" life insurance on Arnoult, but because of Arnoult's advanced age, the

policy was too expensive.  Instead, GECC agreed to accept personal guarantees from Arnoult and Acosta.  Acosta testified that had he believed that AEC did not intend to repay the loan, he would not have personally guaranteed it.

AEC failed to make any payments on the note, and GECC defaulted AEC under the terms of the mortgage.  On June 7, 1996, several months after the loan closing, Mayfield filed an action in district court against the ENERGY VII *in rem* and against AEC. GECC intervened to enforce its preferred ship mortgage on the ENERGY VII.  The court entered summary judgment in GECC's favor. WRT then intervened in the action, seeking to enforce its $1.8 million mortgage on the ENERGY VII.  The court entered summary judgment in favor of WRT, finding that WRT's mortgage on the ENERGY VII primed GECC's mortgage.  GECC and WRT eventually reached a settlement and divided the proceeds from the judicial sale of the ENERGY VII.

Meanwhile, GECC also filed suit against the JANE R *in rem* and against AEC, Arnoult and Acosta *in personam*.  WRT intervened to enforce its mortgage on the JANE R.  On October 29, 1997, the court entered summary judgment in favor of GECC and dismissed WRT's intervention.  The Court held that WRT's mortgage on the JANE R was invalid because it was not granted by the record owner of the vessel.

On September 8, 2000, Acosta filed a voluntary petition for

bankruptcy protection under Chapter 7 of the United States Bankruptcy Code. GECC filed an adversary proceeding, arguing that Acosta's personal guarantee of the GECC loan was nondischargeable in bankruptcy for two reasons. First, GECC argued that the debt was nondischargeable under 11 U.S.C. § 523(a)(2)(A) because Acosta made false representations with the intent to deceive GECC when he failed to disclose the existence of the mortgages and the Mayfield personal injury claim. Second, GECC argued that the debt was nondischargeable under 11 U.S.C. § 523(a)(2)(B) because Acosta obtained money by causing to be made or published, with the intent to deceive, a written statement that was materially false respecting the debtor's financial condition.

After a bench trial, the bankruptcy court found that GECC had failed to meet its burden to prove by a preponderance of evidence that Acosta's debt should be excepted from discharge. The bankruptcy court credited Acosta's testimony that he did not make false representations with the intent to deceive GECC, and it therefore found that Acosta's debt was not excepted from discharge under section 523(a)(2)(A). The bankruptcy court also found that GECC had failed to prove that Acosta "prepared or furnished" any financial statements or financial information, because he simply transmitted information furnished by others. The court therefore held that Acosta's debt was not nondischargeable under section 523(a)(2)(B).

7

The district court affirmed the bankruptcy court's decision on the first claim on similar grounds. The district court affirmed on the second claim because GECC waived the issue by failing to brief and argue that Acosta prepared or furnished financial statements on appeal. GECC timely appeals.

## II. STANDARD OF REVIEW

We review the decision of the district court by applying the same standard to the bankruptcy court's findings of fact and conclusions of law that the district court applied. A bankruptcy court's findings of fact are subject to review for clear error, and its conclusions of law are reviewed *de novo*. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001).

## III. SECTION 532(a)(2)(A) DISCHARGEABILITY EXCEPTION

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt will not be discharged in bankruptcy if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). A creditor must prove its claim of nondischargeability by a preponderance of the evidence. *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001). For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the

8

representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance. *Id*.

Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992). An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Norris*, 70 F.3d 27, 30 n.12 (5th Cir. 1995), citing *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994). Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive. *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997). Thus, a "dumb but honest" defendant does not have scienter. *Id*., *citing* 2 F. Harper, *et al*., Law of Torts § 7.3, at 393 (2d Ed. 1986).

The bankruptcy court found that GECC failed to meet its burden under section 523(a)(2)(A). The court acknowledged that Acosta's silence as to material facts could constitute a false representation. *See In re Mercer*, 246 F.3d at 404. Nevertheless, the court concluded that Acosta's testimony that he

9

believed that the May 18, 1995 memorandum of understanding between WRT and AEC had extinguished the $1.8 million WRT note and mortgage on the ENERGY VII "was at least a reasonable explanation." As for the failure to disclose the Mayfield claim, the court found that Acosta's nondisclosure was not a false representation made with intent to deceive GECC because, although Acosta knew of the default judgment against the two AEC subsidiaries, Mayfield had not sued the ENERGY VII *in rem* or seized the vessel until after the GECC loan closed. Further, there was no evidence that Acosta knew that a maritime lien arising from the personal injury claim would prime GECC's mortgage. The Court held that the preclosing threats made by Mayfield's lawyer that he would seize the vessel were just that, and they did not compel Acosta to inform GECC of the Mayfield claim.

GECC argues that the bankruptcy court's findings were clearly erroneous because, it asserts, the totality of the evidence required the bankruptcy court to find that Acosta made false representations and to infer that he did so with intent to deceive GECC. GECC relies on the absence of language releasing the $1.8 million mortgage from the memorandum of understanding and on a document showing that Acosta represented the $1.8 million WRT mortgage as valid even after the date of the memorandum of understanding. As for the Mayfield claim, GECC

10

asserts that it established that Acosta knew that this uninsured claim existed, that a default judgment had been rendered against AEC's subsidiaries, that the claim gave rise to a maritime lien against the ENERGY VII, that the subsidiaries could not pay the judgment, and that Mayfield's attorney had threatened to seize and sell the ENERGY VII to satisfy the Mayfield claim. GECC also relies on Acosta's failure to disclose the mortgage on the JANE R.

To address GECC's weakest argument first, as to the JANE R, WRT's mortgage was invalid. Thus, Acosta did not make a false representation when he failed to disclose it. We will affirm the lower court's decision if it is correct, even if, as here, we do so for a reason not articulated by the lower court. *Doody v. Ameriquest Mortgage Co.*, 242 F.3d 286, 289 (5th Cir. 2001). GECC's argument as to the mortgage on the JANE R does not warrant further discussion.

We will not set aside the bankruptcy court's findings of fact on the remaining issues unless they are clearly erroneous. *In re Martin*, 963 F.2d at 813-14. We must be "left with the definite and firm conviction that a mistake has been made," before we will disturb the bankruptcy court's factual findings. *Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.*, 346 F.3d 530, 533 (5th Cir. 2003). As long as there are two permissible views of the evidence, we will not find the factfinder's choice between

11

competing views to be clearly erroneous.  *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) (citation omitted).  If the bankruptcy court's account of the evidence is plausible in light of the record viewed as a whole, we will not reverse it.  *Id*.

As to WRT's $1.8 million mortgage on the ENERGY VII, the bankruptcy court based its findings largely on Acosta's testimony concerning his knowledge and intent when he failed to disclose the mortgage.  Acosta provided an explanation for his actions, and the bankruptcy court credited his testimony that he honestly believed that the WRT mortgage had been extinguished by the memorandum of understanding.  As to the Mayfield claim, the bankruptcy court credited Acosta's testimony that he did not believe the claim affected GECC's mortgage.  When the bankruptcy court bases its findings on credibility determinations, this Court gives "due regard" to the opportunity of the bankruptcy court to judge the credibility of the witnesses firsthand.  *In re Webb*, 954 F.2d 1102, 1104 (5th Cir. 1992) (citing Federal Rule of Bankruptcy Procedure 8013).  The bankruptcy court observed Acosta's demeanor and the demeanor of the other witnesses, which placed the bankruptcy judge "in a far superior position to gauge [the debtor's] credibility than this Court is in by merely reading the transcripts."  *In re Martin*, 963 F.2d at 814.  Thus, the bankruptcy court's findings that Acosta honestly believed that WRT's $1.8 million mortgage had been terminated and the personal injury claim would not affect GECC's mortgage are

entitled to significant weight.

Furthermore, our review of the other evidence in the record does not leave us with the definite and firm conviction that the bankruptcy court made a mistake. Rather, bearing in mind that the burden of proof is on GECC, we are convinced that, based on the whole record, the bankruptcy court reasonably found that Acosta did not intend to deceive GECC. Although the memorandum of understanding between WRT and AEC does not mention the $1.8 million WRT mortgage and note, Acosta testified that there were "a lot of things" between WRT and AEC "that were never written." Moreover, Acosta's explanation that he thought the memorandum discharged the $1.8 million debt was confirmed by the search of the Coast Guard records, which revealed no encumbrances on the vessel and, indeed, stated that WRT's mortgage on the ENERGY VII had been terminated. As for the Mayfield claim, it had not been asserted against AEC, and the lawsuit seeking to enforce the maritime lien against the ENERGY VII had not been filed when the loan closed. GECC points to no evidence to contradict the bankruptcy court's finding that Acosta did not know that the personal injury claim might result in a maritime lien that would prime the GECC mortgage, and that finding is plausible in light of the record. Indeed, Acosta did not testify that he knew that a personal injury claim necessarily results in a maritime lien, much less that he knew what priority such a lien would have, if it arose.

13

Having reviewed the record in this case, we conclude that it is plausible that Acosta, although mistaken in his understanding of the effect of the $1.8 million mortgage and of the Mayfield claim, acted without dishonest intent. *See In re Miller*, 39 F.3d 301, 305-06 (11th Cir. 1994) (affirming bankruptcy court's finding that debtors who omitted promissory notes from their financial statements and instead stated the value of their businesses on a net basis did not act with dishonest intent). Although the evidence might support an inference of an intent to deceive, "[it does] not *compel* such a finding and [does] not require us to reverse the court's holding." *Palmacci*, 121 F.3d at 790 (alterations and emphasis in original) (citations omitted). We cannot say that the bankruptcy court clearly erred when it chose not to infer an intent to deceive from the evidence presented to it, or that the district court erred in affirming the bankruptcy court. We therefore affirm the finding that GECC failed to prove by a preponderance of the evidence that Acosta made false representations with intent to deceive GECC.

**IV.   SECTION 523(a)(2)(B) DISCHARGEABILITY EXCEPTION**

Section 523(a)(2)(B) provides that a debt is excepted from discharge to the extent it is obtained by use of a written statement "(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such . . . credit reasonably relied; and (iv) that the debtor caused to be made or

14

published with the intent to deceive." 11 U.S.C. § 523(a)(2)(B). The district court held that GECC waived its appeal of the bankruptcy court's ruling that GECC failed to satisfy section 523(a)(2)(B).

GECC has waived an appeal of this issue in this Court as well. Although GECC listed the waiver ruling as an issue in its statement of the issues and statement of the case, it failed to argue the point in the body of its opening brief. An assertion that a ruling is being appealed, in the absence of any argument in the body of the brief supporting the appeal, does not preserve the issue on appeal. *See Gann v. Fruehauf Corp.*, 52 F.3d 1320, 1328 (5th Cir. 1995). Any argument by GECC on the waiver issue is, therefore, not properly presented for appeal. Moreover, "[a] court may decline to address an argument that is not adequately briefed." *In re HECI Exploration Co.*, 862 F.2d 513, 525 (5th Cir. 1988). Because GECC failed to advance any argument on the waiver ruling in the body of its opening brief on appeal, we find that GECC waived the issue.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court, affirming the bankruptcy court, is AFFIRMED.

15